UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
The Honorable Edward F. Shea

United States of America,

                                        Plaintiff,

        v.

Janet Arnold,

                                        Defendant.

No.  4:18-CR-6044-EFS-1

**Sentencing Memorandum**

**Sentencing**
**April 19, 2022, 10:00 a.m.**
**Richland, Washington**

Janet Arnold has made many mistakes in her life, and made a number of mistakes in operating Desert Wind Family Practice. Paramount among those mistakes was pre-signing prescription paper and permitting her staff to write and issue prescriptions to patients. This practice led directly to the co-defendants in this case (Danielle Mata, Lisa Cooper, Jennifer Prichard, and David Nay) and many others not charged being able to obtain controlled substances in a manner that was not consistent with a legitimate medical purpose and was outside the usual course of professional practice. Though Dr. Arnold was not fully aware of the true scope and extent of the co-defendants' actions and was not an equal participant in their criminal conspiracy, she is nonetheless responsible. But for her actions (pre-signing prescription paper) and but for her failure to properly monitor her own staff, none of the controlled substances at issue would have been inappropriately and illegally obtained. Dr. Arnold takes full responsibility for her actions. This is why she pled guilty and why she comes before the Court to be sentenced and convicted for violating federal law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

That said, this Court has an obligation to impose a sentence that is reasonable. More importantly, this Court has an obligation to consider the evidence in this case, even at sentencing. The evidence attached to this memorandum and further evidence that Dr. Arnold anticipates being put on the record at sentencing show that Dr. Arnold was not the leader of this conspiracy. She was not the mastermind of a criminal enterprise. Rather, her primary significance was being the medical doctor with a prescription pad and a DEA number authorizing her to issue prescriptions for controlled substances. The co-defendants, particularly Danielle Mata, and others (including the United States' undercover patient) largely acted without Dr. Arnold knowing what they were doing. In fact, the evidence is clear that Ms. Mata and others were actively taking measures to hide their actions from Dr. Arnold. Though this has no effect on Dr. Arnold's legal guilt, it should affect the Court's assessment of her culpability.

Dr. Arnold has no prior criminal history. She is 64 years old. Her criminal conduct depended entirely on being a practicing medical doctor; she no longer has her license and never intends to practice medicine again. She is the primary caregiver for her disabled partner, who depends on both her care and her Social Security income to survive. For these and other reasons presented herein and at her hearing, Dr. Arnold requests a sentence of five years' probation, to include a period of home confinement of up to 24 months and any other conditions the Court may deem appropriate in lieu of jail, with no financial penalties aside from the mandatory $100 special assessment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Relevant Facts[1]**

Dr. Arnold operated the Desert Wind Family Practice (DWFP) clinic from approximately 2014 until its closure in May 2017, after the state suspended her medical license. DWFP was a family/general practice clinic. Dr. Arnold was not certified or licensed as a pain management specialist. Nevertheless, a significant number of her patients were dealing with chronic pain and were prescribed controlled substances to manage their pain. Dr. Arnold was the only licensed doctor at DWFP. Her disabled partner, Ted Nobles, often worked at the clinic, in part because he could not be left alone at home for extended hours due to his physical condition. Co-defendants Danielle Mata, Lisa Cooper, and Jennifer Prichard all also worked at DWFP in some capacity in 2016 and 2017.

---

[1] The Court extensively questioned both Dr. Arnold and her counsel at her change of plea hearing regarding the factual basis for her plea of guilty. *See generally* ECF 589. To be clear, Dr. Arnold agreed then and agrees now there is a sufficient factual basis to support her legal guilt of the charged offense. Moreover, Dr. Arnold specifically affirmed every fact the Court questioned her about during her change of plea. *See* ECF 589 at pp. 36-40. Nevertheless, the parties disagree regarding the exact factual nature of the conspiracy and the scope of Dr. Arnold's conduct, as well as Dr. Arnold's knowledge (or lack thereof) of the actions of her co-defendants. The facts set forth herein are all supported by relevant evidence. Where appropriate, Dr. Arnold is submitting documents, audio, or video evidence with this memorandum. Dr. Arnold also anticipates certain evidence being presented at her sentencing hearing through live witness testimony.

Dr. Arnold is filing many of her exhibits under seal because they, to varying degrees, contain personal identifying information of patients, and it is not clear whether this information relates to a real person or not. Because redaction of these exhibits would be extensive and difficult, filing under seal is an appropriate alternative remedy. The United States has no objection to filing these exhibits under seal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Drug Enforcement Administration (DEA) opened an investigation into DWFP in September 2015 following a tip that patients of Dr. Arnold were selling controlled substances prescribed to them. Two weeks into its investigation, the DEA began using a confidential source ("K.C.") as an undercover patient. K.C.'s mission was to report to DWFP as a new patient in order to obtain prescriptions for controlled substances from Dr. Arnold. K.C. manufactured alleged symptoms and conditions in order to do so.

K.C. first went to DWFP on October 9, 2015, and saw Dr. Arnold for a scheduled appointment.[2] During this appointment, Dr. Arnold measured K.C.'s blood pressure; she noted it was high and counseled K.C. about consumption of energy drinks affecting her blood pressure. Dr. Arnold later used a stethoscope to examine K.C.. K.C. reported having what she thought were migraine headaches. After discussing her symptoms with K.C., Dr. Arnold diagnosed K.C. with tension headaches caused by her high blood pressure and relationship stress—K.C. reported she was in the process of relocating from Seattle to the Tri-Cities to get away from an abusive boyfriend. K.C. told Dr. Arnold she had previously used 15mg and 30mg oxycodone for pain. Dr. Arnold was concerned that 30mg is a high dose and issued K.C. a prescription for thirty (30, one per day) oxycodone 15mg pills.

---

[2] There is video of this appointment, but no accompanying audio.

K.C. had a follow-up appointment scheduled on November 6, 2015. Dr. Arnold did not show up at DWFP that day. However, K.C. did meet Danielle Mata on this day.[3] K.C. asked Mata whether she knew anyone to buy oxycodone pills from; Mata advised that she did have a source and told K.C. how much they would cost.[4] Mata also told K.C. that she should try to see Dr. Manawadu[5] in Richland to obtain a prescription because he "handed out prescriptions all day long."[6] Mata and K.C. began communicating by phone and text shortly thereafter.[7]

K.C.'s next scheduled appointment with Dr. Arnold was on November 20, 2015. Again, Dr. Arnold did not show, but Danielle Mata was there.[8] K.C. spoke with Mata, who repeatedly recommended K.C. go to Dr. Brooks[9] in Pasco, and that he "writes

---

[3] *See* Exhibit 1 (DEA reports); Exhibit 2 (excerpts of video recordings).

[4] *See* Exhibit 2 at 00:45-1:27.

[5] Dr. Bing Manawadu appears to practice medicine at V5 Medical Center in Richland, with a "passion" for "pain medicine including acute and chronic pain." *See* http://www.v5medical.com/our-providers.html. A search of this Court's filing system shows that he has never been charged in a criminal case in the Eastern District of Washington. There is no indication that the United States has ever investigated Dr. Manawadu.

[6] Exhibit 1 at p. 4. The United States has not produced any audio or video recording of this conversation between Mata and K.C..

[7] *See* Exhibit 3 at p. 1. This document was originally produced in discovery as an Excel spreadsheet titled "2017-10-25_210729_509-397-7699_ALL_Printer_Friendly." Dr. Arnold converted the file to a PDF for the purpose of filing, and made no changes to the document's contents.

[8] *See* Exhibit 4 (excerpts of video recordings).

[9] Dr. Victor Brooks had his medical license suspended in April 2016 for overprescribing controlled substances. *See* John McKay, "Pasco Doctor Suspended for Prescription Abuse, Controlled Substances," News Talk KFLD 870AM (Apr. 5, 2016), https://newstalk870.am/pasco-doctor-suspended-for-prescription-abuse-controlled-substances/; Kathleen Jacob, "Documents: Kennewick doctor in trouble before with

anything."[10] Mata asked K.C. if she was out of her medication; when K.C. said yes, Mata said she could get medications for her through her brother-in-law (David Nay), who has "oxy's" and fentanyl.[11]

K.C. next attempted to see Dr. Arnold on January 20, 2016.[12] Dr. Arnold was not there but K.C. spoke with Mata on the phone. As she had done before, Mata offered to get K.C. whatever she needed.[13] Mata also again recommended that K.C. see Dr. Manawadu.[14]

Dr. Arnold saw K.C. for an appointment on February 1, 2016. Dr. Arnold measured K.C.'s blood pressure and noted that it was elevated (as it also was at her last appointment); she counseled K.C. to cut back on her caffeine intake.[15] Dr. Arnold asked K.C. what her average daily pain was; K.C. said a "7."[16] This was the same as her last appointment. K.C. asked about getting multiple prescriptions or post-dated

---

health department," KEPR TV (Apr. 6, 2016), https://keprtv.com/news/local/documents-kennewick-doctor-in-trouble-before-with-health-department. According to publicly available charging documents, the allegations against Dr. Brooks included "substandard management of chronic pain and prescribing controlled substances," including hydrocodone, oxycodone, OxyContin, fentanyl, and methadone. *See* http://keprbim.s3.amazonaws.com/Brooks_Victor.pdf. A search of this Court's filing system shows that Dr. Brooks has never been charged in a criminal case in the Eastern District of Washington. There is no indication that the United States has ever investigated Dr. Brooks.
[10] Exhibit 4 at 00:18-1:15, 3:00-3:29.
[11] Exhibit 4 at 1:40-2:45.
[12] *See* Exhibit 5 (DEA report); Exhibit 6 (excerpts of video recordings).
[13] *See* Exhibit 6 at 00:50-1:04.
[14] *See* Exhibit 5 at p. 1.
[15] *See* Exhibit 7 (2-1-16 video) at 00:48-1:03, 1:50-2:07.
[16] *See* Exhibit 7 at 2:29-2:38.

prescriptions; Dr. Arnold immediately said no to both requests.[17] K.C. then asked about increasing the quantity of pills and asked for 120. Dr. Arnold noted this would be 4/day and she was currently being prescribed 1/day. Arnold did increase K.C.'s prescription to 2/day.[18] Next, K.C. asked about increasing the dose from 15mg to 30mg and claimed 15mg was not effective. K.C. then told Dr. Arnold she sometimes took two of her 15mg pills for an effective 30mg dose. Dr. Arnold immediately instructed her not to misuse her medication or she would "fire" her as a patient.[19] Dr. Arnold further counseled K.C. about causing rebound headaches and increasing her tolerance if she misused her medications.[20] Toward the end of the visit, Dr. Arnold again counseled K.C. about her blood pressure and recommended cutting back on caffeine and cigarettes.[21]

K.C. had another appointment with Dr. Arnold on February 17, 2016. Dr. Arnold increased K.C.'s prescription from 60 pills to 90 pills.[22] This was apparently due in part to Mata asking Dr. Arnold to increase K.C.'s prescription when she met with Arnold prior to K.C.'s appointment.[23] Because the recording device died prior to K.C. meeting with Dr. Arnold, there is no record of what questions or counseling Dr. Arnold provided to K.C. during the actual appointment.[24]

---

[17] *See* Exhibit 7 at 2:48-3:04.
[18] *See* Exhibit 7 at 3:21-3:57.
[19] *See* Exhibit 7 at 4:18-5:08.
[20] *See* Exhibit 7 at 5:33-6:02.
[21] *See* Exhibit 7 at 6:07-6:30.
[22] *See* Exhibit 8 at p. 4.
[23] *See* Exhibit 8 at p. 3.
[24] *See* Exhibit 8 at p. 3 (noting the device died at approximately 4:44 p.m.).

Mata began working at DWFP in approximately February 2016. On February 22, 2016, Mata texted L.S. (someone she frequently bought and sold controlled substances to and from) to tell him she now had "access to schedule program and script program from doc."[25] A week later, Mata told L.S. that she could "print scripts" but still needed Dr. Arnold's signature on the prescriptions.[26] Not long after beginning to work for Dr. Arnold, Mata began conspiring with others to issue prescriptions without Dr. Arnold's knowledge. Two specific partners in crime were Lisa Cooper[27] and Mata's brother-in-law, David Nay.[28] Cooper began receiving controlled substances for herself on March 19, 2016.[29] The same day, she and Mata "began colluding to create prescriptions in other patient names."[30] A few days later, on March 22, 2016, Mata told Nay she was "going to print scripts without" Dr. Arnold and asked "do u want me to print you anything?"[31] Nay requested three prescriptions, all of which Mata wrote the same day.[32]

K.C. had another appointment with Dr. Arnold on March 2, 2016. At the DEA agents' urging, K.C. submitted a refill request card and attempted to increase the quantity to 120 pills.[33] While waiting for this refill, K.C. waited in a side room with Mata

---

[25] Exhibit 9 at pp. 3-4.
[26] *See* Exhibit 9 at p. 5.
[27] *See* Exhibit 10.
[28] *See* Exhibit 11.
[29] *See* Exhibit 10 at p. 3.
[30] Exhibit 10 at p. 2.
[31] Exhibit 11 at p. 11.
[32] *See* Exhibit 11 at p. 11.
[33] *See* Exhibit 12 (3-2-16 video) at 0:41-2:01

and spoke with her. Mata coached K.C. on what to say to get Dr. Arnold to increase her prescription.[34] K.C. got her refilled prescription, but not the requested increase. She and Mata then spoke about this before K.C. left.

Not long after this, Mata enlisted K.C. as a co-conspirator in her criminal scheme. On March 30, 2016, K.C. called Mata at 9:39 p.m. and they spoke for almost 17 minutes.[35] Approximately two hours later, Mata called K.C. and they spoke again for approximately 5 minutes.[36] K.C. would then text Mata at 11:42 p.m. to say, "I'm down. We need to talk more about it. … But we def need to talk more about this. I'm in… And know people."[37] These phone calls and texts occurred two days before a planned trip to Pendleton, Oregon. The next day, March 31, K.C. texted Mata: "If I text you names can you bring them tomorrow?"[38] Mata said yes, but she had a "bit of a hang up" because "Janet is at office."[39] Mata would go on to ask K.C. if the names she had were "trustworthy," said she was "going back and forth on doing this" and "can up yours with no issue."[40]

On April 1, 2016, K.C. and Mata were going to meet up at a hotel in Pendleton, Oregon. At some point that day, Mata spoke on the phone with Lisa Cooper.[41] After

---

[34] *See* Exhibit 12 at 2:04-3:33.
[35] *See* Exhibit 3 at p. 21.
[36] *See* Exhibit 3 at p. 21.
[37] Exhibit 3 at p. 21; Exhibit 13 at p. 2.
[38] Exhibit 3 at p. 21; Exhibit 13 at p. 3.
[39] Exhibit 3 at p. 21; Exhibit 13 at p. 3.
[40] Exhibit 3 at p. 21; Exhibit 13 at p. 3.
[41] *See* Exhibit 14.

Mata told Cooper she was worried about her family's income, Cooper said they could "create some mystery fucking patients."[42] Mata later spoke on the phone with K.C. while making the drive to Pendleton.[43] Mata told K.C. that she had run by the doctor's office and printed off two prescriptions.[44] Mata explained she was running late because she had difficulty finding Dr. Arnold's signature to copy on the copy machine. K.C. responded that she would "practice it," referring to Dr. Arnold's signature.[45] Later, when discussing filling the prescriptions that Mata was bringing for K.C., K.C. said she would make sure to fill it on a day when Mata was in the office to answer phones. Mata said it would be "bad luck" if Dr. Arnold answered the phone.[46]

Mata met up with K.C. at the hotel in Pendleton late in the evening on April 1, 2016.[47] Mata gave K.C. the two prescriptions she had brought and again talked about how difficult it was to find Dr. Arnold's signature to copy.[48] Once inside the hotel, K.C. brought up "what we talked about" and said she knew "trustworthy" people.[49] They then explicitly discussed a plan for Mata to write and issue prescriptions, without Dr. Arnold knowing, to persons K.C. knew; Mata would then fill those prescriptions and sell the controlled substances, splitting the money with Mata. K.C. said she would hang

---

[42] Exhibit 14 at 00:48-00:55.
[43] *See* Exhibit 15.
[44] *See* Exhibit 15 at 00:30-00:33.
[45] *See* Exhibit 15 at 00:55-1:22.
[46] *See* Exhibit 15 at 1:50-2:10.
[47] *See* Exhibit 16 (DEA reports); Exhibit 17 (excerpts of video recordings).
[48] *See* Exhibit 17 at 00:16-00:52.
[49] Exhibit 17 at 00:55-1:03.

onto prescriptions and wait to fill them on days when Mata is in the office to verify them.[50] Mata brought up different medications they should write prescriptions for in order to make better money. Mata discussed not only putting fake patients in the DWFP computer system, but also generating a prescription then deleting it from the system to hide their actions from Dr. Arnold.[51]

Mata advised K.C. she should pretend she got in a car accident so that Dr. Arnold would increase her medications and prescribe her fentanyl.[52] Mata told K.C. they hit the "jackpot" with Dr. Arnold's prescription pad.[53] Mata also said she "brought it up" to K.C. because she could tell K.C. was "making money somehow" and "you know the game better than I know the game."[54] Mata said she was thinking about this plan "since the third day I met you."[55] Mata also talks about a plan she had to rob a pharmacy and went on to describe a specific one in Pasco she had scouted, both during the day and at night, taken pictures of, and confirmed had no surveillance.[56] Immediately after discussing this robbery plan, Mata said she was "a criminal" and thought she was "made to be a criminal."[57]

---

[50] *See* Exhibit 17 at 2:18-2:38. *See also* Exhibit 16 at p. 5.
[51] *See* Exhibit 17 at 4:47-5:43.
[52] *See* Exhibit 17 at 8:32-9:05.
[53] Exhibit 17 at 10:41-10:45.
[54] Exhibit 17 at 10:47-11:28.
[55] Exhibit 17 at 11:52-11:57.
[56] *See* Exhibit 17 at 12:43-14:15.
[57] Exhibit 17 at 14:15-14:20. *See also* Exhibit 16 at p. 6.

Not long after this meeting in Oregon, K.C. filled the extra prescription that Mata had brought for her and sold the drugs. She told Mata she would give her half of the proceeds, about $500.[58] Approximately a week later, Mata and K.C. spoke on the phone. During the call, Mata discusses having recently "figured out" the codes.[59] Mata also told K.C. that she could increase K.C.'s prescriptions "without her knowing," in reference to Dr. Arnold.[60] Additionally, Mata told K.C. she would increase K.C.'s prescriptions and print off three copies, "you just figure out the signature."[61] Mata also asked if K.C. could think of anyone to bring in as a new patient to see the doctor once and get put in the system, as they would then be good to issue prescriptions in that patient's name for at least six months after.[62] Mata told K.C. she would mail some prescriptions to her the next day, while the office was closed—in other words, when Mata was at the office without Dr. Arnold.[63] Mata said she would put them in the office's outgoing mailbox, which "she" (Dr. Arnold) could not open.[64] Indeed, the next day, Mata mailed prescriptions to K.C. and told her what to do with codes, also referencing that K.C. would need to do the signature.[65]

---

[58] *See* Exhibit 18 at p. 1.
[59] Exhibit 19 at 0:59-1:13.
[60] Exhibit 19 at 1:13-1:28.
[61] Exhibit 19 at 2:34-2:56.
[62] *See* Exhibit 19 at 3:24-3:55.
[63] *See* Exhibit 19 at 4:01-4:17.
[64] *See* Exhibit 19 at 4:46-4:57.
[65] *See* Exhibit 13 at p. 4.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Mata's criminal nature continued to run unchecked in May 2016. She texted K.C. on multiple occasions to say that Dr. Arnold was out of town, meaning Mata could print prescriptions without interference or fear of being caught.[66] On May 26, she texted David Nay to issue prescriptions to two patients (N.L. and R.I.).[67] Mata actually proactively called ahead to a pharmacy regarding N.L. with a story that he would be leaving to work in Alaska to justify the increase on the prescriptions.[68] She also pressed Nay to confirm he was good to go because she only had a few pre-signed prescriptions which she was "going to use one way or another."[69]

Mata was making efforts to hide her actions, particularly from Dr. Arnold. When texting Nay on May 26, she said she would have to do N.L.'s and R.I.'s prescriptions "when she leaves," referencing Dr. Arnold.[70] Mata later told Nay she was worried about the pharmacy sending a fax for a preauthorization to Dr. Arnold's laptop.[71] Mata also asked Nay to make sure to tell her when the patient went to the pharmacy so she could keep the office phone on her person so that Dr. Arnold would not answer it.[72] These efforts reflect a concern Mata mentioned to J.O. (Nay's spouse) during a phone call approximately a week earlier, where she talked about issues with Nay.[73] Mata was

---

[66] *See* Exhibit 13 at pp. 4-5.
[67] *See* Exhibit 11 at pp. 12-15.
[68] *See* Exhibit 11 at p. 14.
[69] Exhibit 11 at p. 13.
[70] Exhibit 11 at p. 14.
[71] *See* Exhibit 11 at p. 15.
[72] *See* Exhibit 11 at p. 15.
[73] *See* Exhibit 20.

worried she would get in trouble and "catch a felony" because she was "changing the script and okaying something the doctor hasn't."[74] Mata was particularly concerned that Dr. Arnold would review records and "see that I did it."[75]

Despite her concerns for being caught, Mata would continue to issue unauthorized prescriptions using pre-signed paper. In early June 2016, K.C. texted Mata information for three fake patients (T.C., J.S., and R.A.) to issue prescriptions for.[76] K.C. also requested an appointment with Dr. Arnold on June 20 and told Mata they could go in "after she leaves."[77] In the days leading up to this appointment, Mata repeatedly texted K.C. asking her to remind Mata to delete prescriptions that she had increased out of the system so that Dr. Arnold would not see it.[78] Ultimately, Mata realized she could not delete the prescription and she texted K.C. to coach her about what to say to Dr. Arnold if she asked K.C. about the increase.[79]

K.C. had an appointment scheduled with Dr. Arnold on June 20, 2016. Arnold did not show, but K.C. met Mata at DWFP's offices.[80] Immediately after K.C. entered the office, Mata told K.C. she thought she "fucked up."[81] Mata then told K.C. she provided unauthorized prescriptions to a patient who was friends with Lisa Cooper,

---

[74] *See* Exhibit 20 at 00:48-57.
[75] *See* Exhibit 20 at 1:13-1:18.
[76] *See* Exhibit 13 at pp. 5-6.
[77] *See* Exhibit 13 at p. 6.
[78] *See* Exhibit 13 at pp. 7-8.
[79] *See* Exhibit 13 at p. 8.
[80] *See* Exhibit 21 (DEA report); Exhibit 20 (excerpts of video recordings).
[81] Exhibit 20 at 0:18-0:20.

that Cooper was allegedly at a pharmacy attempting to fill those prescriptions, and the pharmacy may have faxed a confirmation request directly to Dr. Arnold's computer.[82] After K.C. locked the DWFP door, Mata explained there was no way for her to intercept any fax, which goes directly to Dr. Arnold's laptop.[83] Mata ultimately concluded that Cooper was lying. Mata then showed K.C. how to create fake prescriptions in the computer using pre-signed prescription paper.[84]

Mata created unauthorized prescriptions for a fake patient, and printed out prescriptions both in that name and for K.C. directly.[85] Mata and K.C. explicitly discussed the need for Mata to be available to verify prescriptions, rather than Dr. Arnold.[86] Mata would reiterate this from time to time. For example, on July 1, 2016, she texted K.C. that she was "leaving doc at office alone for hour" and said "don't let anyone call for verification!"[87] Later in August, Mata told K.C. to get prescriptions filled on a particular day so that she would be there to verify if pharmacies called, so as not to risk that a "new chick" working at DWFP answering the phone on another day.[88]

---

[82] *See* Exhibit 21 at p. 1; Exhibit 20 at 0:20-0:52.
[83] *See* Exhibit 20 at 1:12-1:24.
[84] *See generally* Exhibits 18 and 19.
[85] *See* Exhibit 21 at p. 2.
[86] *See* Exhibit 21 at p. 2.
[87] *See* Exhibit 13 at p. 9.
[88] *See* Exhibit 13 at pp. 10-11.

Mata continued conspiring not only with K.C., but also with David Nay, issuing unauthorized prescriptions in coordination with him in June, July, and August 2016.[89] In one instance, she had to "sneak in office" to do it.[90] Another time, she told Nay she could only do this "when doc isn't in town."[91]

In early October 2016, Mata called Nay to discuss their scheming.[92] Nay mentioned two patients who should be ready. Mata told Nay that they would be "hard to do, when I got the doc there."[93] Later the same month, Mata texted Nay to have one of his people go to the pharmacy "before doc and I got in to office."[94] She added, "if rag head calls and I'm not there yet we are fucked."[95] "Rag head" is presumably an ethnic slur directed at a pharmacist of some ethnicity or religion who wears a turban or other head garment. In any event, it is clear Mata stressed to all her co-conspirators the importance that Dr. Arnold not be around when these unauthorized prescriptions were filled. This was still the case in December 2016, when Mata had to "get away from doc" and "get rid of doc" before printing another unauthorized prescription for someone working with Nay.[96]

---

[89] See Exhibit 11 at pp. 16-21.
[90] See Exhibit 11 at pp. 18-19.
[91] See Exhibit 11 at pp. 20-21.
[92] See Exhibit 23 (audio recording of October 7, 2016 phone call between Mata and Nay, with embedded transcript prepared by United States).
[93] See Exhibit 23 at 0:53-0:56.
[94] See Exhibit 11 at p. 22.
[95] See Exhibit 11 at p. 22.
[96] See Exhibit 11 at pp. 23-24.

As late as March 22, 2017, only 42 days before the DEA raided DWFP, Mata continued to hide her actions from Dr. Arnold. That day, K.C. met up with Mata at DWFP. Jennifer Prichard and L.S. were also there; Dr. Arnold was not.[97] K.C. entered DWFP through the rear door, which was unlocked; she tried to lock the door behind her.[98] K.C. met Mata, who was in Dr. Arnold's office rather than the reception desk. Prichard and L.S. would join them both in Dr. Arnold's office. L.S. expressed a concern that Dr. Arnold would "flake out" and disappear, even if she was no longer under investigation, as Mata seemed to think. Mata said she would just be "Dr. Danielle Arnold" then.[99] L.S. responded that Mata better "learn" and "study" Dr. Arnold's signature.[100] L.S. later told Mata to do "the right quantity" on his prescriptions because Dr. Arnold "accidentally" had reduced them.[101]

Mata and K.C. went up to the main reception desk. Prichard told Mata there were only four pieces of pre-signed paper in the front printer.[102] Prichard later clarified there were approximately ten total pieces of pre-signed paper.[103] K.C. asked Mata if she could get ten prescriptions; Mata said she could maybe do three prescriptions for K.C. with the paper she had.[104] Mata printed three prescriptions for K.C.; K.C. gave Mata

---

[97] *See* Exhibit 24 (DEA report); Exhibit 25 (excerpts of video recordings).
[98] *See* Exhibit 25 at 0:38-1:10.
[99] *See* Exhibit 24 at p. 2; Exhibit 25 at 3:30-3:55.
[100] *See* Exhibit 25 at 3:55-4:05.
[101] *See* Exhibit 24 at p. 2; Exhibit 25 at 4:52-5:06.
[102] *See* Exhibit 25 at 5:06-5:44.
[103] *See* Exhibit 24 at p. 3; Exhibit 25 at 5:45-6:00.
[104] *See* Exhibit 24 at p. 3; Exhibit 25 at 6:00-6:20.

$200 for these prescriptions.[105] After finishing with K.C., Mata then printed prescriptions for L.S., asking him for specific directions on what to prescribe.[106]

The DEA raided DWFP on May 3, 2017, executing a federal search warrant. During their search of the clinic, agents found pre-signed prescription paper in multiple locations, including 26 pages in Jennifer Prichard's purse.[107] Agents questioned Prichard about this. Her story was that she had been at the clinic a few nights ago, found the back door unlocked, and found the pre-signed paper in the printer. Prichard said she took the paper to keep it secure. Prichard also said she told Mata about this, but not Dr. Arnold.[108] Mata told a similar story when questioned.[109] Neither of them said they reported the security breach (an unlocked back door and pre-signed paper being left unsecure) to Dr. Arnold. Additionally, Prichard did not explain (and perhaps was never asked) why the paper was still in her purse at approximately 2:00 p.m. when the DEA went into the clinic, as she presumably could have returned the paper immediately upon coming into work.

Prior to the DEA's raid and subsequent shutting down of DWFP, Cooper obtained 173 prescriptions for fentanyl, oxycodone, amphetamine pills, somas, and Xanax.[110] The DEA further determined that David Nay (Mata's brother-in-law)

---

[105] *See* Exhibit 24 at p.3; Exhibit 25 at 6:20-8:45.
[106] *See* Exhibit 24 at p. 3; Exhibit 25 at 8:45-9:13.
[107] *See* Exhibit 24 at p. 1, 3-4.
[108] *See* Exhibit 24 at p. 4.
[109] *See* Exhibit 24 at pp. 4-5.
[110] *See* Exhibit 10 at p. 3.

Sentencing Memorandum:  18

obtained approximately 167 prescriptions for himself and eight others for carisoprodol, fentanyl, and oxycodone.[111] As to L.S., he received prescriptions under his name and at least three others.[112]

A few months after DWFP closed, Mata began cooperating with the DEA and the United States. During her first interview in September 2017, Mata described printing out prescriptions onto pre-signed paper both when Dr. Arnold was in the office and when she was not.[113] Mata also admitted writing unauthorized prescriptions, but said she did so only for "about 5 people" and she "never received payment," which is not true at least in the case of K.C.[114] During another interview in October 2017, Mata discussed numerous patients from DWFP, many of whom she wrote unauthorized prescriptions for.[115] During a third interview in February 2018, Mata claimed she had once confessed to Dr. Arnold that she wrote an unauthorized prescription for Lisa Cooper under another name.[116] Mata claims that Dr. Arnold confronted Cooper about this via text messages, fired Cooper as a patient, and forgave Mata.[117] It is not clear when this alleged confession occurred. Dr. Arnold is not aware of any corroborating evidence of this confession, including the alleged text messages sent to Cooper, being

---

[111] *See* Exhibit 11 at p. 1.
[112] *See* Exhibit 9 at p. 1.
[113] *See* Exhibit 26 at p. 7.
[114] *See* Exhibit 26 at p. 9.
[115] *See* Exhibit 26 at pp. 9-17.
[116] *See* Exhibit 26 at p. 20.
[117] *See id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

produced in discovery. Whether this one-time confession occurred or not, Dr. Arnold has cited extensive evidence to this point showing Mata consistently went to great lengths to hide her actions from Dr. Arnold, even as late as March 22, 2017, just 42 days prior to the DEA raid.

In sum, Dr. Arnold wrongfully (and illegally) pre-signed prescription paper, which Mata and others used to issue unauthorized prescriptions to both real patients and fake patients at DWFP. Dr. Arnold should have never done this. She takes full responsibility for that, as well as for failing to meaningfully monitor and review every prescription written and issued with her signature on it. That is why she is guilty of a criminal offense. Still, Dr. Arnold was not a full-fledged member of this conspiracy. There is a meaningful distinction between willful blindness and willful participation; Dr. Arnold is guilty of the former but not the latter. Mata and others hid their actions quite successfully from her. Dr. Arnold did not directly benefit from the unauthorized prescriptions that Mata and others issued and filled; Mata and her co-conspirators split the money and the drugs. This Court should not lump Dr. Arnold in as an equal with them, at least with respect to her intent and the scope of her knowledge.

The one area where Dr. Arnold acted directly and can be judged for her actions alone is her care of K.C. and prescriptions she chose to issue to K.C. The United States' proposed expert, Dr. Enzian, testified that Dr. Arnold's care of K.C. did not fall within

the scope of legitimate medical practice.[118] While Dr. Arnold admits she provided substandard care to K.C., she disagrees that her care of K.C. was so inadequate as to warrant indictment by itself. Dr. Arnold believed she was treating a patient suffering from legitimate pain, who reported pain symptoms to her during every visit.

Were there additional actions Dr. Arnold should have taken to be a better doctor for K.C.? Yes. Are the unauthorized prescriptions that Mata wrote for K.C. without Arnold's knowledge a problem? Yes. Nevertheless, Dr. Arnold acted like a doctor toward K.C. She met with her multiple times. She diagnosed K.C. with tension headaches based on her described symptoms. Dr. Arnold counseled K.C. about watching her blood pressure, drinking less energy drinks, smoking fewer cigarettes, and properly taking her prescribed medications to avoid increasing her medication tolerance or causing rebound headaches. Dr. Arnold refused K.C.'s requests to issue post-dated prescriptions, write multiple prescriptions during a single visit, and to increase her medication to certain quantities or dosages unless warranted by her symptoms. Dr. Arnold may have provided inadequate care to K.C., but it is clear her practice of pre-signing prescription paper caused far more substantial harm, even to K.C. herself, who got prescriptions through Mata because of this practice.

---

[118] *See* ECF 681-1 (Dr. Enzian report dated January 15, 2019).

## Impact of Plea Agreement

Dr. Arnold pled guilty to one count of conspiracy to distribute and possess with intent to distribute controlled substances.[119] This count has no mandatory minimum and carries a statutory maximum of 20 years' imprisonment. The parties stipulated that the base offense level would be 32. The United States agreed to request a sentence of 108 months or the low-end of the guideline range, whichever is lower. Dr. Arnold is free to argue for any legal sentence. Dr. Arnold may only appeal her sentence if the Court imposes a sentence exceeding 10 years. The Court is not bound by any recommendations in the plea agreement.

## U.S.S.G. Advisory Sentencing Guidelines

The U.S. Probation Office has filed a draft presentence investigation report[120] calculating an advisory guideline range of 135-168 months. Dr. Arnold has no objections to the draft PSR that would affect the guideline range. Notably, this high range is driven almost entirely by the quantity of oxycodone, which accounts for more than 93% of the total drug weight.[121] Oxycodone is worth 6700 times its weight when converted under the guidelines.[122] But for this draconian conversion, the advisory guideline range would be substantially lower.

---

[119] *See* ECF 578.
[120] *See* ECF 632.
[121] *See* ECF 632 at p. 39 (24,938.47kg converted drug weight of total 26,785.28kg).
[122] *See* U.S.S.G. § 2D1.1, cmt. app. n. 8(D) (1 gram of actual oxycodone converts to 6700 grams, or 6.7 kilograms, of "converted drug weight").

As this Court is fully aware, the guideline range is advisory only. The Court is not bound by either law or the plea agreement in this case to base its sentencing decision on the advisory guideline range. Though the Court must consider them, the Court need not follow them.

### Position on Sentencing

Dr. Arnold is requesting a sentence of five years' probation, with up to two years of that spent on home confinement. She recognizes this is a significant departure and variance below the advisory guideline range. Nevertheless, such a sentence would be appropriate but not greater than necessary to punish Dr. Arnold for her actions, deter her from engaging in any further criminal activity, and to reflect the seriousness of her culpability.

Dr. Arnold is 65 years old. Given her age, she poses a generally low risk of recidivism.[123] Recidivism rates for older offenders tend to be the same whether they are sentenced to probation or prison.[124] Moreover, Dr. Arnold has no prior criminal history. This further indicates she poses a minimal risk to re-offend.[125]

---

[123] *See* U.S. Sentencing Commission, "The Effects of Aging on Recidivism Among Federal Offenders," (Dec. 7, 2017) at p. 9 (noting that offenders 65 years and older have a recidivism rate of only 13.4 percent), *available at:* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9.

[124] *See id.* at p. 32 (noting a recidivism rate of 15.0% for "probation or fine only" offenders 65 and older, and 18.0% for "prison only" offenders 65 and older).

[125] *See* U.S. Sentencing Commission, "Criminal History and Recidivism of Federal Offenders," (Mar. 9, 2017), at p. 12 (noting that offenders with zero criminal history

It is also important to remember that Dr. Arnold's criminal actions in this case were a direct result of her being a medical doctor with a license to prescribe controlled substances. Dr. Arnold has long ago lost her medical license (not long after the DEA searched her clinic) and has no intent to attempt to regain it or ever practice medicine again. It is fair to presume that Dr. Arnold poses no risk of committing criminal acts otherwise, given her law-abiding nature for the remainder of her life.

Dr. Arnold has been on pretrial release with this Court since the outset of the prosecution in September 2018 (and was at liberty in the community before that since her clinic closed in May 2017), approximately 3 ½ years. During that time, she has not had any violations or issues, including during a period where she was homeless for a few months and living out of her car with her disabled partner and their dogs. Dr. Arnold's actions are particularly notable when compared to her co-defendants, three of whom (Mata, Cooper, and Nay) have been remanded to custody during the case. Ms. Cooper remained in custody until sentenced and is now in federal prison. Ms. Mata was remanded in November 2021; a month later, the Court found her guilty of eight total violations of pretrial release, including being discharged from multiple substance abuse treatment programs, failing to submit to drug testing, tampering with her drug tests (including apparently using fake urine), and using methamphetamine and fentanyl.[126]

---

and no prior contact with the criminal justice system have a significantly lower recidivism rate than other offenders).

[126] *See* ECF 661.

In contrast, Dr. Arnold has not violated any of the terms of her pretrial release for the past 3 ½ years. She has shown up for every scheduled court hearing (sometimes by phone or video, with the Court's permission). She has never attempted to flee, not after the DEA raided her clinic in May 2017, nor after she was indicted in September 2018, nor any time prior to pleading guilty in September 2021, and she continues to patiently await her sentencing next month. Her compliance with the Court's orders and lengthy documented compliance with pretrial release should merit significant consideration and show the Court that removing her from the community is neither necessary nor appropriate.

Dr. Arnold has significant personal health problems. Her personal health issues, as well as her own personal addiction struggles,[127] caused her to be out of the office quite frequently, further enabling her co-defendants and others to more easily hide their actions from her. Imprisoning Dr. Arnold would be a more significant punishment for her compared to healthier persons, given limitations that prevent the Bureau of Prisons for providing the same level of care that a person can receive at liberty in their community.

Dr. Arnold is also the primary caregiver for her disabled partner, T.N. She has significant concerns about his health and well-being is she is forced to go to prison.

---

[127] Despite her personal feelings on the subject, there is ample evidence in discovery that Dr. Arnold was frequently using alcohol, marijuana, and multiple prescription medications, and that her use of these substances was often a cause of her missing work.

T.N. suffered a serious case of Acute Respiratory Distress Syndrome (ARDS) in 2007, having to be in a medically induced coma and intensive care for several weeks.[128] He has lost some brain function, has mild dementia, nerve issues, and significant back and leg pain. He has a limited ability to walk (itself a new function from rehab while this case was pending; he was wheelchair bound at the outset of this case). T.N. is dependent on Dr. Arnold daily for his basic needs, including but not limited to getting out of bed, cleaning and showering, and using the bathroom. T.N. has depended on Dr. Arnold to help him with these needs for the majority of the last 15 years. T.N. did attempt to be cared for in a nursing home facility once, but claims he was sexually molested. He consequently has a fear of returning to any nursing home or rehabilitation facility. Both T.N. and Dr. Arnold are concerned that, without her, he may end up on the street and quickly deteriorate.

The United States is recommending a significantly lengthy prison sentence of nine years. While the United States' desire to combat opioid-related drug use (including fentanyl) is understandable, imprisoning Dr. Arnold will do nothing to meaningfully combat this problem. Her clinic has been closed; her license has been suspended. She is no longer a danger to her patients or the community, and never will be again so long as she never regains her medical license, which she has no intend to do.[129] Sending Dr.

---

[128] *See* ECF 632 at p. 42 ¶ 163.

[129] Should the Court wish to impose a Special Condition of probation prohibiting her from attempting to re-obtain her medical license, Dr. Arnold would not object to this. She genuinely has no intent to ever practice medicine again for the rest of her life.

Arnold to prison will not meaningfully deter any other doctors or medical care providers more than actual investigation and enforcement by both the United States and state medical licensing boards would. As many studies have shown, the likelihood of getting caught is a far more significant deterrent to persons breaking the law. There is evidence in the United States' own discovery of at least two other doctors that Mata alleged were similarly loose with prescriptions, yet there is no evidence of either of those doctors ever being investigated, and neither has been charged with a criminal offense in this Court. Any sentence the Court imposes against Dr. Arnold will serve only to punish her and reflect the severity of her actions. Attempting to "send a message" to other doctors through her sentencing will have a negligible effect on others, but will meaningfully affect Dr. Arnold.

Becoming a convicted felon is a significant punishment in and of itself for Dr. Arnold, who will lose many important rights and public benefits. Moreover, in lieu of imprisonment, Dr. Arnold is requesting a 24-month period of home confinement. Not only will she have to incur the cost of paying for electronic home confinement, but this also will sufficiently restrict her liberty to a substantial degree. Dr. Arnold has already had her liberties restricted for the past 3 ½ years on pretrial release, for which she gets no formal credit and whatever weight the Court chooses to give her for her excellent behavior. Imposing a sentence of probation along with lengthy home confinement will be a serious punishment. It is no proverbial slap on the wrist.

Numerous persons have written letters of support on Dr. Arnold's behalf.[130] Those letters reflect many common themes—Dr. Arnold is a good person who cares for others. She is helpful. She has maintained long relationships with friends from her youth. She cared about her patients' health. She does not seem like the kind of person the Court needs to send to prison.[131] Dr. Arnold hopes the Court will attempt to see her in the same way these people do, instead of how the United States portrays her as "nothing more than a drug dealer in a white coat."[132]

One final point: the United States references approximately 11 cases in its sentencing memorandum where various doctors receive sentences from 52 months up to 300 months, with most receiving 8-10 years.[133] The United States makes no effort to show how any of these defendants' cases or personal circumstances are comparable to Dr. Arnold. Just as it did with some of its proposed trial exhibits, the United States is merely showing the Court (as opposed to the jury) big scary-sounding numbers to make its recommendation of 108 months seem reasonable and appropriate.

Dr. Arnold is just as capable of pointing this Court to cases where doctors received far lower sentences, including probation. *See, e.g., United States v. Andrzej Zielke*, 2:17cr295 (W.D. Pa. Nov. 1, 2021) (sentence of 1 day imprisonment, followed by 3 years of supervised release with 15 months of home confinement, for unlawfully

---

[130] *See* Exhibit 27.
[131] *See id.*
[132] ECF 681 at p. 7.
[133] *See* ECF 681 at pp. 10-11.

distributing Schedule II controlled substances, healthcare fraud, and money laundering); *United States v. Jennifer Farrell*, 3:19cr204 (D. Ct. May 27, 2021) (30 days' imprisonment followed by 3 years of supervised release for a doctor convicted for unlawfully distributing drugs, largely for her own personal use); *United States v. George Appiah*, 1:20cr111 (E.D. Va. Oct. 30, 2020) (24 months' imprisonment for pharmacist convicted of conspiracy to distribute controlled substances); and *United States v. Porfirio Orta-Rosario*, 3:07cr154-3 (W.D.N.C. June 23, 2010) (60 months' imprisonment for doctor convicted on 51 total counts following trial). In fact, one such case occurred before this Court. In *United States v. James Stein-Sheridan Shelby*, the Court imposed a sentence of 3 years' probation with 15 months of home confinement.[134] Your Honor actually referenced this case during pretrial proceedings in Dr. Arnold's case, seemingly finding it comparable.

The fact is that both the United States' and Dr. Arnold's string-cited selected cases are of little value to the Court in a vacuum. Without adequate context for these cases and countless others like them, this Court cannot possibly know whether it will create any "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when it sentences Dr. Arnold.[135] Consequently, Dr. Arnold trusts the Court will focus on her conduct, her personal circumstances, and her positive and negative equities in reaching its decision.

---

[134] *See* 2:18-cr-102-LRS, ECF 121 (July 25, 2019).
[135] 18 U.S.C. § 3553(a)(6).

**CONCLUSION**

Dr. Arnold recognizes that she made many mistakes, both in her life at large and in her medical practice specifically, over the years DWFP was open. She does not deny this. She has pled guilty to a criminal conspiracy to distribute controlled substances, and she is prepared to face the consequences of her actions. However, sending Dr. Arnold to prison is neither necessary nor appropriate. She has shown for the past 3 ½ years that she is not a danger to the community, and that she is more than willing to comply with orders and conditions of this Court. Dr. Arnold is 65 years old, will never again practice medicine, and is the primary caregiver for her disabled partner. This Court need not punish her any further.

For the reasons set forth herein, Dr. Arnold requests a sentence of 5 years' probation. She further requests that the Court impose a special condition of up to 24 months' home confinement while she is on probation as a sufficient punishment in lieu of imprisonment, along with any other conditions the Court may deem appropriate. Aside from the cost of electronic home monitoring and the mandatory $100 special assessment, Dr. Arnold requests that the Court not impose any fine or financial penalty because she would be unable to pay it given her limited income and resources.

Dated:  March 15, 2022.

By s/ Paul E. Shelton
Paul E. Shelton, 52337
Federal Defenders of Eastern
Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920
(509) 248-9118 fax
Paul_Shelton@fd.org

## Certificate of Service

I hereby certify that on March 15, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following: George JC Jacobs, III, and Dominique J. Park, Assistant United States Attorneys.

s/ Paul E. Shelton
Paul E. Shelton